# Exhibit C

# Expert Report of Monte K. Gore

Date:      February 24, 2023

Subject:   *John Snorsky v. Beeler, et al.,* Civil Action No. 1:18-cv-03025-KLM
           United States District Court, District of Colorado
           Mr. Snorsky's Request for Permanent Injunctive Relief

Dear Mr. Homiak:

Per your request, I have reviewed the file in this matter and have analyzed the current and future threat to Mr. John Snorsky ("Mr. Snorsky") by the 211 Crew and affiliated prison gangs in the event he was transferred out of Protective Custody and back into general population. This report summarizes my credentials, as well as the results of my research and my opinions regarding Mr. Snorsky's housing situation. A list of resources I considered in preparing my opinions is attached as Exhibit 1. My curriculum vitae is attached as Exhibit 2. I have not testified as an expert in the last four years. I am charging $200 per hour for my time working on this case. If you need further information, please do not hesitate to contact me.

## QUALIFICATIONS & EXPERIENCE

I am a law enforcement executive with 35 years' experience in policing and corrections. I began my career in the Summit County Sheriff's Office, where I spent 12 years and ultimately earned the rank of Captain. Among my responsibilities were updating policies to comply with Colorado law, including changes to Colorado statues and regulations, court decisions, and county directives. I supervised all jail operations, managed personnel, and directed crisis response for the office. During this time, I also pursued a Bachelor's degree in Criminal Justice from St. John's University, where I graduated with a 4.0 in 2000.

From 2000 to 2016, I served as Jail Administrator and Undersheriff of the Park County, Colorado Sheriff's Office. For the next six years, I served as Sergeant in the Colorado Department of Corrections' Buena Vista Correctional Facility ("BVCF"), where I supervised corrections officers and inmates in the Restrictive Housing and Protective Custody units. Among other things, I was directly responsible for inmate behavior and responding to emergency situations. While I was Sergeant at BVCF from 2017 to 2021, I met John Snorsky. I was assigned to the Protective Custody and Restrictive Housing units at BVCF at the time Mr. Snorsky was in the Protective Custody unit. Mr. Snorsky spoke to me personally about threats the 211 Crew and other gangs had made against him on multiple occasions, how he cooperated with an investigation against 211 Crew member Chad Merrill, and how he was attacked at Mr. Merrill's behest before moving to Protective Custody at BVCF. He showed me his stab wounds. He explained that his three attackers were affiliated with several other gangs, which exacerbated the threat against him. I confirmed with other staff that, in their

1

opinion, there was a serious threat to Mr. Snorsky from the 211 Crew (and their affiliates), that the 211 Crew was an excessively violent gang, and that Mr. Snorsky had cooperated in an investigation against 211 Crew leader Chad Merrill. It was clear to me from my personal interactions with Mr. Snorsky that he was terrified of retaliation by the 211 Crew and other gangs while in Protective Custody. Based on the information he provided me, which I corroborated, that fear was entirely reasonable.

During my interactions with Mr. Snorsky, I saw how he could get under the skin of other corrections officers. He has a habit of frequently complaining (about food and other things) that frustrated staff, particularly inexperienced staff who didn't have the training or experience to appropriately respond to Mr. Snorsky's mental health issues. But Mr. Snorsky is, all things considered, a smart person, not to mention a brilliant artist. He would sometimes show me the art he was working on and share with me the contests he entered into and awards he won. Provided a safe environment, Mr. Snorsky is not a particularly challenging or violent inmate. Based on my experience and a review of his records, in my opinion, Mr. Snorsky does not pose a safety threat to any other inmates or staff.

Through my decades of experience in corrections, I developed expertise in the history and activities of Colorado gangs—including street and prison gangs. I have personal experience responding to gang violence both in and out of prison and strategizing regarding gang-related custody issues. I have been commended for my efforts to work proactively in resolving gang violence before it occurs. I have had significant gang training in my law enforcement and corrections career. I have direct, personal experience working with members of various prison gangs (including the gangs discussed herein) and took significant efforts to identify gang members and separate them when necessary. As explained below in more detail, this process of entering "custody issues" for inmates with rival gang affiliations is far from perfect, and is by no means a guarantee that gang violence will not occur. I also completed the CDOC Training Academy, which includes extensive gang training.

I left BVCF in January of 2021, and then served as Warden at the Vigil-Maldonado Detention Center in New Mexico for approximately a year and a half. Since May 2022, I have served as the County Manager of Colfax County in Raton, New Mexico.

## SUMMARY OF OPINIONS

1. The 211 Crew is a White Supremacist Prison Gang Known for its Unparalleled Violence and Unprecedented Reach and Organization Within the CDOC and Beyond;

2. If Returned to General Population, John Snorsky Faces a Serious Threat of Bodily Injury or Death from the 211 Crew and its Affiliated Prison Gangs;

3. Protective Custody Offers Threatened Prisoners like John Snorsky Significant Protections from Other Prisoners that are Not Available in General Population; and

4. Alternatives to Protective Custody Will Not Protect John Snorsky from the Threat of Serious Bodily Injury or Death Posed by the 211 Crew and Affiliated Prison Gangs.

## OPINIONS

### 1. The 211 Crew is a White Supremacist Prison Gang Known for its Unparalleled Violence and Unprecedented Reach and Organization Within the CDOC and Beyond.

The 211 Crew is a large prison gang based in Colorado. "211" is a numeric code for the letters "BAA," which stands for "Brotherhood of Aryan Alliance."[1] The crew is founded on white supremacist ideology.[2] The 211 Crew came into existence in 1994, when Benjamin Davis was housed in a predominantly African American cellblock and was attacked by two African American prisoners. "His perception was that the Hispanic jail population and the African-American jail population were well-enough organized that they could protect each other against assault or homicide attempts by other race members. He became convinced that if he was going to make it in prison, he would need to organize enough people of similar beliefs that they could protect each other from the Black and Hispanic gangs."[3] The gang incorporated Irish, Viking, and Nazi symbols into their identity. In just one year, the gang had 300 members.[4] By 2017, it had 1,000 members in and out of prison across the country. Based on my experience, it is more than likely that the 211 Crew has grown significantly since then. The 211 Crew is constantly trying to recruit new members to the gang through intimidation and violence.

The gang's white supremacist ideology led to intimidating—often with violence—the very Caucasian inmates the gang was formed to protect. For example, in 2010, former CDOC prisoner Scott Howard testified at a Department of Justice hearing that he was "repeatedly raped, assaulted, and extorted by members" of the 211 Crew.[5] He testified that he repeatedly sought protection from prison officials, but that his efforts only put him at greater risk. "Because I am openly gay," he testified, prison officials "blamed me for the attacks. They said as a homosexual I should expect to be targeted by one gang or another."[6] Evidence at the

---

[1] *See 211 Crew*, ANTI-DEFAMATION LEAGUE, https://www.adl.org/resources/hate-symbol/211-crew (last visited February 20, 2023).

[2] *Colorado Prison Officials Have Banished 211 Crew Leaders Across U.S. But Are They Spreading White Supremacist Seeds?* THE DENVER POST, https://www.denverpost.com/2017/09/07/colorado-211-crew-leaders-across-country/(last visited February 20, 2023).

[3] *See 211 Crew Prison Gang's Violent Culture Roils Behind, Beyond Bars*, THE DENVER POST, https://www.denverpost.com/2013/03/26/211-crew-prison-gangs-violent-culture-roils-behind-beyond-bars/ (last visited February 20, 2023).

[4] *See A Prison Gang Member was Overheard Plotting a "Pizza Party" for a Prosecutor. He Didn't Mean Food.,* THE WASHINGTON POST, available at https://www.washingtonpost.com/nation/2019/05/13/prison-gang-member-was-overheard-plotting-pizzaparty-prosecutor-he-didnt-mean-food/ (last visited February 20, 2023).

[5] *Raped and Extorted by a Prison Gang, Scott Howard, was Called a Drama Queen by Corrections Officials*, WESTWORD, available at https://www.westword.com/news/raped-and-extorted-by-a-prison-gang-scott-howard-was-called-a-drama-queen-by-corrections-officials-5111568, last visited February 20, 2023.

[6] *See id.*

hearing showed that corrections officers were themselves involved with the 211 Crew.[7] Mr. Howard testified that, despite the many state facilities in which he had been in custody for his modest financial crimes, he "had never seen [a prison gang] that operated so openly, with so little official interference."

In my experience, the 211 Crew targets anyone they perceive to have wronged them. Their "hit lists" often include prosecutors and judges.[8] But the 211 Crew also targets minorities and anyone they perceive as working against the gang's initiatives. Violence is effectuated by a "shot caller," who assigns a target to someone in the gang, often to prove loyalty to the gang. The 211 Crew will also work with other gangs to effectuate their hit list, often in exchange for money, drugs, sex, or other favors. Some members of the 211 Crew—particularly Mr. Merrill—will often target individuals they perceive to be sex offenders or "child molesters." Rival gang members or prisoners who have cooperated with investigators against the 211 Crew are often the subject of the most heinous violence at the hands of the 211 Crew and its affiliates.

The 211 Crew historically communicated via notes hidden in prison library books and other means. The 211 Crew has ties to powerful prisoners not officially involved with the gang. For example, the 211 Crew partnered with Simon Sue—a mastermind murderer—who helped the gang hide extra radios (which undoubtedly improved their communications).[9]

The 211 Crew gained notoriety in 2013, when it organized the murder of CDOC Executive Director Tom Clements at his home. Colorado police had no indication that the 211 Crew was targeting Mr. Clements prior to the murder.[10] The investigation ultimately revealed that the 211 Crew organized the murder from behind bars, communicating with a gang member on parole by phone in the days leading up to the murder. As a result of this notorious and

---

[7] *See id.* Mr. Howard eventually received a modest settlement in a civil rights lawsuit, based largely on evidence that he had made credible requests for protection to CDOC officials that were ignored. *Id.* This evidence "cast doubt on the veracity of several sworn affidavits" by CDOC officials. *Id.*

[8] For example, in December 2018, 211 Gang member Billie Allen was overheard planning a "pizza party" for a district attorney, which was to take place at 2:11 a.m. Mr. Allen said: "I'm going to make sure something happens. I'm going to make sure I have a pizza delivered to him. He's going to get that [expletive] pizza." *See supra* n. 4. It is widely believed that the "pizza party" was referencing the 2013 murder of CDOC Executive Director Tom Clements, who was murdered when a 211 Gang member posed as a pizza delivery driver and then shot and killed Clements on his doorstep. *See also Weld DA Michael Rourke Targeted in Murder Plot by White Supremacist Gang, Unsealed Court Documents Reveal*, GREELEY TRIBUNE, available at https://www.greeleytribune.com/2019/05/10/weld-da-michael-rourke-targeted-in-murder-plot-by-white-supremacist-gang-unsealed-court-doc%E2%80%A, last visited February 20, 2023).

[9] *See supra* n. 5.

[10] *Director of Colorado Prisons Fatally Shot at Home*, THE NEW YORK TIMES, available at https://www.nytimes.com/2013/03/21/us/director-of-colorado-prisons-fatally-shot-at-home.html, last visited February 20, 2023 (emphasis added).

violent feat, the 211 Crew grew "more brazen" after 2013, believing that "if it can kill the executive director of the Colorado Department of Corrections, *it can get away with anything*."[11]

After the notorious murder of Mr. Clements in 2013, the CDOC implemented an executive protection program for the Executive Director and his staff, evidencing that the CDOC knew that the 211 Crew and its affiliates are highly dangerous, organized, and capable of violence both in and out of prison. To the best of my knowledge, this program is still in place, meaning the CDOC still considers the 211 Crew to be a threat.



Chad Merrill, 211 Gang leader.

The 211 Crew's organized violence and intimidation tactics only grew over the next decade. Mr. Merrill is a particularly violent individual. He is serving a life sentence for gang-related activities outside of prison. As described in the table below, he is responsible for several high-profile murders in various correctional institutions. I have personal experience with Mr. Merrill, and have watched surveillance videos of Mr. Merrill's most recent murder and his behavior after, which included celebrating his murders in front of other inmates and then turning himself in. Mr. Merrill's behavior indicates that he has a penchant for extreme violence, cannot let go of a grudge—even when he has no information to substantiate the grudge—and has nothing to lose. Even when Mr. Merrill was in Restrictive Housing units, I saw him hang up pictures of his victims. He is proud of the murders he has committed. He is the most evil, dangerous, and violent individual I have come across in my decades in law enforcement and corrections.

The founder of the 211 Crew, Benjamin Davis, ultimately died by suicide. After his death, prison gang experts predicted that Davis's ideology would only be "cemented" by his death. "That's not the end of the 211 Crew. They'll raise him up and exalt him. They'll not just follow him but put their lives on the line for him. They're going to make his death into a conspiracy to promote their gang."[12] When asked whether Davis's death would be the end of the 211 Crew, one 211 Crew member responded: "No. Absolutely not. People are staying the [expletive] away from us because **we are the most respected gang in DOC**. [Clements' shooting] was the biggest murder in Colorado history. We have a hierarchy just like you guys say. . . . We've got a real tight rein."[13]

---

[11] *The White Supremacist Gang Linked to Colorado Prison Chief's Assassination Five Years Ago Continues Killing,* THE DENVER POST, available at https://www.denverpost.com/2018/03/17/white-supremacist-gang-211-crew-tom-clements-murder,/ last visited February 20, 2023.

[12] *See supra* n. 2.

[13] *See supra* n. 2 (emphasis added).

5

The 211 Crew is particularly dangerous due to its affiliations with other influential prison gangs. After the notorious murder of Mr. Clements, the gang "merged" with other white supremacist prison gangs, including the Aryan Syndicate and the American Nazi Party. Because of the gang's violent reputation and threatening behavior, other gangs frequently cooperate with the 211 Crew in carrying out its "hit list."

The following table shows the most prolific acts of violence committed by the 211 Crew in the last decade. These violent acts and murders are only a glimpse of the 211 Crew's unprecedented reach, organization, and violence:

| | **Notorious Murders by the 211 Crew** |
|---|---|
| Mar. 19, 2013 | **Murder of Nathan Leon and CDOC Executive Director Tom Clements**. 211 Crew member Evan Ebel kidnapped and murdered Nathan Leon, a pizza delivery driver, to acquire his uniform. Mr. Leon was a father of three who had taken the part-time pizza delivery job to make ends meet. After acquiring Mr. Leon's uniform, Mr. Ebel then arrived at Mr. Clements' doorstep, where he shot and killed Mr. Clements in the chest with a nine-millimeter handgun. Evidence showed that 211 Crew members were in contact with Mr. Ebel hundreds of times in the days before the murder. Evidence suggested that Mr. Ebel was ordered to murder Mr .Clements because "he had run afoul of the 211 Crew founder Davis while in prison and was in debt to the 211 Crew." These murders show the unprecedented organization and reach of the 211 Crew. The 211 Crew's ability to coordinate the murder of the highest-ranking CDOC executive at his home from behind bars is unlike any prison gang activity in Colorado history.[14] |
| Aug. 11, 2014 | **Murder of Cody Gray at Sterling Correctional Facility.** 211 Crew members stabbed and killed Cody Gray at the Sterling Correctional Facility at the behest of 211 Crew and Aryan Empire generals.[15] |
| June 6, 2015 | **Murder of Joshua Edmonds at Limon Correctional Facility**. 211 Crew member Chad Merrill (the 211 Crew member that ordered the 2017 hit on Mr. Snorsky) stabbed and murdered Joshua Edmonds with a shank at Limon Correctional Facility. As Mr. Merrill described the incident to Mr. Snorsky a few days later, Mr. Merrill wrongfully believed that Mr. Edmonds was imprisoned for a sex offense (something that personally offended Merrill). Mr. Merrill told other 211 Crew members and indicated that he would "take care of it." Merrill proceeded to choke Edmonds "so long [his] arms when [sic] numb," before punching Mr. Edmonds in the throat and then stabbing him In the neck with a shank 30 times. |

---

[14] *Signs of Broader Conspiracy in Assassination of Colorado Prison Chief Tom Clements,* GAZETTE, available at https://gazette.com/news/signs-of-broader-conspiracy-in-assassination-of-colorado-prison-chief/article_4e9126ea-c112-11e9-ad37-df6c17698082.html, last visited February 20, 2023 (referring to the Clements murder as "one of the most notorious killings in Colorado history").

[15] *See supra* n. 13.

| | |
|---|---|
| | Mr. Merrill then stood on Mr. Edmonds' neck for approximately ten minutes, before dragging his body out into the pod.[16] |
| July 14, 2018 | **Murder of Matthew Massaro at Buena Vista Correctional Complex**. Chad Merrill, Daniel Egan (the 211 Crew's second-in-command)[17], and Brett Boyles murder 32-year-old Matthew Massaro at Buena Vista Correctional Complex. Mr. Merrill, Mr. Boyles, and Mr. Egan murdered Mr. Massaro in his cell. They attempted to remove critical arteries from his neck and crushed his skull so that he could not be revived. They did this in front of cameras and other inmates. It was clear they were making the statement: If you stand in the way of the 211 Crew or do anything to upset the gang this is what will happen to you. Mr. Massaro was murdered because the 211 Crew believed he was a sex offender. After being charged with the murder, a Chaffee County judge lowered Mr. Egan's bond to $50,000 which Mr. Egan posted to gain release.[18] |

## 2. If Returned to General Population, John Snorsky Faces a Serious Threat of Bodily Injury or Death from the 211 Crew and its Affiliated Prison Gangs.

In my opinion, because Mr. Snorsky has been identified as a "rat" and "snitch" by the 211 Crew and other active prison gangs, and as a result has been listed on various "hit lists," Mr. Snorsky faces a serious risk of bodily injury or death if not protected from individuals associated with these gangs. By way of background, the following table is a timeline of events relevant to the threat the 211 Crew poses and will continue to pose to Mr. Snorsky:

| Timeline of Threats & Attacks on John Snorsky in the CDOC System | |
|---|---|
| Sept. 2014 | Mr. Snorsky, then a 26-year-old artist with a troubled upbringing, abusive parents, and who had been sexually assaulted while in juvenile corrections, is imprisoned for an "attempted kidnapping." The "attempted kidnapping" lasted just moments |

---

[16] Colorado Department of Corrections, Office of the Inspector General, Supplemental Case Report. Discovery page 210.

[17] *'Aryan Warriors' Prison Gang Leader and Murder Suspect Daniel Egan Sought by Police After Skipping Court*, NEWSBREAK, available at https://www.newsbreak.com/news/2633426782587-aryan-warriors-prison-gang-leader-and-murder-suspect-daniel-egan-sought-by-police-after-skipping-court, last visited February 21, 2023.

[18] *Manhunt Underway for Accused Killer*, 9NEWS, available at https://www.9news.com/article/news/crime/manhunt-underway-accused-killer/73-1a69092c-f865-4a56-b0bb-75387a3cd466, last visited February 21, 2023.

| | |
|---|---|
| | and resulted in no harm to the victim.[19] Mr. Snorsky pleaded guilty and was sentenced to 30 years in prison.[20] |
| June 16, 2015 | Mr. Snorsky cooperates with the Office of the Inspector General investigators regarding the murder of Josh Edmonds. He provides a recorded statement explaining that what happened to Mr. Edmonds could happen to him, and that the white supremacist control "needs to stop," and expressing frustration at Mr. Merrill's continued housing with other inmates, particularly ones who could not physically protect themselves against Merrill. The investigator indicated that Mr. Snorsky may be placed in protective custody. Mr. Snorsky tells the investigator "**I want to be protected**," and repeatedly expressed concerns that he was being housed with gang members and being incorrectly targeted by them as a sex offender, just like Mr. Edmonds. Mr. Snorsky indicated that he was willing to testify against Mr. Merrill due to the brazen and cold nature of the murder. He is ultimately disclosed in court documents as a witness for the prosecution against Mr. Merrill.[21] |
| Jan. 12, 2016 | Mr. Snorsky is assaulted in his day hall by fellow inmate Lonnie Herrera, who throws feces at him and stabs him with a shank.[22] |
| Jan. 29, 2016 | Mr. Snorsky writes a letter to Case Manager Leslie Beeler attaching a request for Protective Custody. Relevant excerpts from that letter include: "Here's the PC form I filled out. I hope this **describes my situation and makes clear the constant threat against me** . . . all my serious write ups are from me trying to arm myself just in case I get jumped or stabbed again. Did you know that before I came here . . . I had been transferred to 3 prisons in 3 months **due to the custody issues with the . . . 211s who have attack[ed]/jumped me, stabbed me, threatened me and tried to extort me** . . . My pleas for help fall upon deaf ears**. Then that results in me being jumped or stabbed. And I think it's kinda unfair for me to be subjected to serious injuries or even death**. . . . I don't want to have to hurt anyone or get hurt myself…Anyways, I hope I haven't made you hate me and that you'd help me please! Oh and by the way it was nice to talk to you today and hope I wasn't too much of a bother. And could you stop by my cell when you make rounds or send me message back to let me know you got the form." |
| July 22, 2016 | Mr. Snorsky again requests to be placed in Protective Custody. Upon review, officers determine that Mr. Snorsky is at a "High/Impending" threat level because Mr. Snorsky has agreed to testify against Chad Merrill. As explained by the officers, "[e]very time he is escorted to an area, the other inmates start threatening him. This has been verified by escorting staff. Also verified with investigators here |

---

[19] *John Snorsky, "Self-Taught Artist," Arrested in Aurora Kidnapping*, HUFFPOST, available at https://www.huffpost .com/entry/john-snorsky-aurora_n_4213464, 9NEWS, last visited February 21, 2023.

[20] *John Snorsky Judge to Child Kidnapper: "You Are the Bogeyman,"* WESTWORD, available at https://www.westword.com/news/john-snorsky-judge-to-child-kidnapper-you-are-the-bogeyman-6281130?storyPage=2, last visited February 21, 2023.

[21] *See supra* n. 18, Discovery Page 209.

[22] *See* Colorado Department of Corrections, Office of the Inspector General, Case Report CDOC_00001-24.

|              | at SCF that it is very possible that paperwork could be floating around about him testifying in the Limon murder trial involving Merrill. [Snorsky] refuses to leave SCF restricted housing. **He said he is not safe in Gen Pop and that he wants to go to Protective Custody."** |
|---|---|
| Aug. 10, 2016 | Protective Custody interview with Mr. Snorsky in which he explained his situation with respect to the 211 Crew. Mr. Snorsky's protective custody request is denied. |
| Aug. 30, 2016 | Mr. Snorsky informs staff that a "hit" has been ordered on him. Corrections officers confirmed the threat and Mr. Snorsky was placed on lock down. |
| Oct. 17, 2016 | Mr. Snorsky informs corrections officers about his concerns about the 211 Crew and that "he does not feel safe," and asked what he needed to do to be placed in protective custody. |
| Feb. 16, 2017 | Corrections officers deny Mr. Snorsky's request for Protective Custody again, despite validating the threat against him. |
| Feb. 22, 2017 | Mr. Snorsky is attacked by three prisoners (Danny Samson, Jaray Trujillo, and Christopher Clark) and is stabbed approximately 40 times, apparently in retaliation for Mr. Snorsky's agreement to testify against Mr. Merrill. Mr. Snorsky sustained serious injuries including a collapsed lung, and was transported by ambulance and helicopter for immediate medical treatment. Mr. Snorsky cooperates with CDOC investigators, informing intelligence officers of the identities of his attackers. |
| Mar. 15, 2017 | Mr. Snorsky re-applies for Protective Custody, explaining that in early 2017 he was attacked by Lazaro Aguillar and stating: "If I don't get PC and a safe long-term housing solution I'll be murdered in Colorado DOC for the above reasons. **I'm begging for help**." |
| Mar. 23, 2017 | Mr. Snorsky's request for transfer to Protective Custody is approved. |
| Aug. 27, 2017 | Mr. Snorsky is transferred to Protective Custody at the Arkansas Valley Correctional Facility. |
| Feb. 2021 | Armando Diaz, a member of the Bloods gang, assaults Mr. Snorsky while he was in Protective Custody, yelling out "Blood" during the assault.[23] After the assault, Mr. Diaz continued to threaten and harass Mr. Snorsky continually.[24] |
| July 2021 | Mr. Snorsky is transferred out of Protective Custody and back to a general population unit for a minor infraction without a hearing. Mr. Diaz was permitted to remain in Protective Custody. |

These are only a handful of examples of times Mr. Snorsky has been threatened but denied protective custody. Mr. Snorsky also testified in the April 2022 preliminary injunction hearing that an inmate in his day hall, Jason Payne, informed him that a high-ranking 211 Crew

---

[23] Prelim. Injunction Hearing Transcript [ECF No. 160], Johnson Testimony, at 130:13-22; *see also* Order Granting Injunctive Relief [ECF No. 161] at 29.

[24] Prelim. Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony, at 80:23-85:20.

member ordered Mr. Payne to stab Mr. Snorsky because Mr. Snorsky is a "rat" and a "snitch."[25] Although Mr. Payne disobeyed the order—putting himself in jeopardy—these ongoing threats against Mr. Snorsky indicate that he is still on a 211 Crew "hit list" and that the threat will persist in perpetuity. Additionally, Mr. Snorsky testified that other inmates in his day hall know that he was disclosed as a witness to testify against 211 Crew members (and other gang members), that he is a "snitch," and that he is on several hit lists.[26] Mr. Snorsky also testified that he has been threatened by members of the Aryan Circle gang who are affiliated with Mr. Merrill and the 211 Crew.[27]

In my opinion, given these consistent threats from the 211 Crew and their affiliates, returning Mr. Snorsky to general population is tantamount to a death sentence. Mr. Snorsky is well-known within the CDOC generally, and the 211 Crew has a very serious reason to target him: he cooperated with OIG investigators and prosecutors in the prosecution of Chad Merrill for the murder of Josh Edmonds.

Mr. Snorsky will likely be harmed by the 211 Crew (or its affiliates) if returned to general population in any number of ways. He could be housed directly with members of the 211 Crew. Even if efforts are made to avoid this, the 211 Crew is affiliated with other dangerous prisoners who would not be identified by the custody issues the CDOC offers here. Mr. Snorsky could also be harmed outside of his cell during work hours, free time, or outdoor recreation. He could be harmed in the hallways between various units. The possibilities for how Mr. Snorsky could be injured or killed in general population are truly endless. Given the 211 Crew's penchant for violence and nonexistent remorse, there is no limit to what the 211 Crew could do to retaliate against Mr. Snorsky for testifying against Mr. Merrill and the others. In my view, because Mr. Snorsky put himself in extreme danger to cooperate in the Edmonds murder prosecution, the CDOC has a moral and ethical responsibility to protect him from retaliation. Based on my decades of experience in law enforcement and corrections, the only chance Mr. Snorsky has at survival within the CDOC system is housing in Protective Custody.

Additionally, it is my opinion that the threat by the 211 Crew against Mr. Snorsky will endure in perpetuity. In my experience, once the 211 Crew has identified an individual on their "hit list," that individual will remain a target until the hit is complete. In my view, there is no chance that the threat to Mr. Snorsky will dissipate over time. The 211 Crew's unprecedented reach and number mean that Mr. Snorsky could be harmed by anyone at any time so long as he is in general population. That the 211 Crew was able to recruit members of three different

---

[25] *Id.* at 87:7-89:5.

[26] *Id.* at 92:1-93:19; 121:7-17. Mr. Snorsky also testified that a member of the GKI Gang said to him: "Your name is Snorsky, right? Yeah my homie [Trujillo] is one of the dudes that almost killed you, bro." *Id.* at 116:1-117:15. Mr. Snorsky further testified that the GKI Gang member recited how Mr. Snorsky was attacked, made fun of him for asking why he was being attacked, and indicated that Mr. Snorsky is a "snitch" and gave him the impression that he was in serious danger from the GKI Gang. *Id.*

[27] Preliminary Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony, at 100:15-20 & 101:2-10.

gangs (i.e., GKI, Hawaiian Family, and the North Side Mafia) to carry out a murder attempt on Mr. Snorsky in February 2017 shows that its reach is not limited to 211 Crew members. To put it simply, if Mr. Snorsky is returned to general population, it is only a matter of time before he is killed. This is particularly true considering the 211 Crew members—and Mr. Merrill in particular—are interested in using violent acts to "make statements" to other inmates. They are highly motivated to make an example out of Mr. Snorsky for agreeing to testify against a prolific gang member like Mr. Merrill.

Unfortunately, the threat to Mr. Snorsky is not limited to the 211 Crew. After the attack on Mr. Snorsky by Mr. Trujillo, Mr. Samson, and Mr. Clark in 2017 (in retaliation for Mr. Snorsky's agreement to testify against Merrill), Mr. Snorsky cooperated with OIG investigators, identified his attackers, and cooperated with the criminal prosecutions of each of his attackers. As a result, Mr. Snorsky's reputation as a "snitch" was intensified and solidified with their respective gangs. Indeed, the CDOC ultimately recognized the imminent threat posed by these individuals by listing "custody issues" for them and Mr. Snorsky in June 2017. Mr. Snorsky was ultimately placed in Protective Custody as a result of this threat. To my knowledge, the CDOC has presented no information to suggest that the threat has dissipated, nor do I believe that it has. Mr. Snorsky was identified on "hit lists" by these individuals and the gangs with which they are affiliated.

These gangs unfortunately are everywhere within the CDOC system. In my opinion, if Mr. Snorsky is transferred out of protective custody to any facility within the CDOC system, it is very likely that he will be housed with members of these gangs[28] and exposed to a significant threat of bodily injury or death.

The following sections provide a brief background of several other prison gangs that have targeted Mr. Snorsky, with an explanation for why these gangs, along with the 211 Crew, will continue to pose a risk to Mr. Snorsky if he is returned to general population.

**GKI Gang**

Mr. Snorsky also faces an imminent risk of bodily harm or death from members of the GKI Gang. The GKI gang is "one of the largest and most violent" gangs in Colorado, and it operates "in essentially all [Colorado] Department of Corrections' facilities."[29] The GKI Gang is notorious for killing individuals they perceive to be "snitches." In 2018, for example, three GKI Gang members kidnapped and murdered a woman they accused of being a "snitch." They shot the woman 10 times as she begged for her life. These individuals are now,

---

[28] Prelim. Injunction Hearing Transcript [ECF No. 160], Winegardner Testimony, at 131:2-22.

[29] *Leaders of Violent Street Gang Convicted of Organized Crime,* CBS COLORADO, available at https://www.cbsnews.com/colorado/news/leaders-of-violent-street-gang-convicted-of-organized-crime/, last visited February 21, 2023 ("Other members of the GKI are known to have killed witnesses they believed to have cooperated with police.")

of course, in prison.[30] Members of the GKI Gang work together with members of the 211 Crew. Mr. Trujillo, one of the prisoners who brutally attacked Mr. Snorsky in February 2017 in retaliation for Mr. Snorsky's cooperation in the prosecution of Mr. Merrill—is a member of the GKI Gang.[31] And even after the attack, Mr. Snorsky has been explicitly threatened by Mr. Trujillo.[32] In my opinion, any member of the GKI Gang poses a significant risk to Mr. Snorsky because he is labeled as a "snitch" and a "rat," and because Mr. Snorsky has cooperated with officials against at least one member of the gang.

The ongoing threat that Mr. Snorsky faces from the GKI Gang was made clear during the April 2022 hearing on Mr. Snorsky's request for preliminary injunction. During that hearing, Mr. Snorsky testified that, after he arrived at CSP in July 2021, he was approached by a GKI Gang member named "Mr. Isaiah"—who immediately recognized him and said that his "homie" (i.e., Mr. Trujillo) was "one of the dudes that almost killed [Mr. Snorsky]" in February 2017.[33] Mr. Isaiah went on to "recite to [Mr. Snorsky] explicitly how [he] was stabbed" and making fun of him for getting stabbed.[34] I agree with Mr. Snorsky's interpretation of this interaction as an implicit threat from Mr. Isaiah on behalf of the GKI Gang.[35]

**Hawaiian Family Gang**

There are various gangs across the country consisting of prisoners from Hawaii or the Pacific Islands generally who have banded together for protection. One of these gangs—the Hawaiian Family gang—is powerful in the CDOC. Danny Sampson, one of the prisoners who brutally attacked Mr. Snorsky in February 2017—is a member of the Hawaiian Family Gang.[36] In my opinion, any member of the Hawaiian Family poses a significant risk to Mr. Snorsky because he is labeled as a "snitch" and a "rat," and because Mr. Snorsky has cooperated with officials against at least one member of the gang.

**North Side Mafia**

The North Side Mafia is a long-standing gang that originated in North Denver.[37] Mr. Snorsky

---

[30] *3 Gang Members Found Guilty of Killing Denver-Area Woman They Labeled as a Snitch*, FOX31—2, available at https://kdvr.com/news/local/3-gang-members-found-guilty-of-killing-denver-area-woman-they-labeled-a-snitch/, last visited February 21, 2023.

[31] Prelim. Injunction Hearing Transcript [ECF No. 160], Johnson Testimony, at 137:8-20.

[32] Prelim. Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony, at 112:1-117:4.

[33] Prelim. Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony, at 116:16-24.

[34] Prelim. Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony, at 117:1-4.

[35] Prelim. Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony, at 117:5-15.

[36] *See supra* n. 34.

[37] *This Thug's Life*, Westword, available at https://www.westword.com/news/this-thugs-life-5068373, last visited February 21, 2023. The North Side Mafia's anthem "North, North" describes the gang as "killers and thugs" who "never show pity." *Id.*

also faces an imminent risk of bodily harm or death from members of the North Side Mafia. Christopher Clark, one of the prisoners who brutally attacked Mr. Snorsky in February 2017—is a member of the North Side Mafia.[38] In my opinion, any member of the North Side Mafia poses a significant risk to Mr. Snorsky because he is labeled as a "snitch" and a "rat," and because Mr. Snorsky cooperated with officials against at least one member of the gang. In addition, Mr. Snorsky testified in the April 2022 preliminary injunction hearing that he was shown a Northside Mafia "hit list" by an inmate affiliated with the Northside Mafia that goes by the moniker "Pyrex."[39] Lt. Johnson confirmed during the hearing that CSP's Intelligence Unit had found a North Side Mafia "hit list" with Mr. Snorsky's name and the word "rat" with a star next to it.[40]

**CMG Bloods Gang**

The GMG Bloods gang is a notorious, nationwide street and prison gang known for acts of violence, including murder. The Bloods are very active in Colorado, with one notorious gang member sentenced to 30 years in federal prison for multiple murders in 2019.[41] Mr. Diaz, who physically attacked Mr. Snorsky on February 10, 2021 (screaming "Bloods" and calling Mr. Snorsky a "bitch")[42] while he was in protective custody at BVCF is affiliated with the Bloods gang.[43] Mr. Snorsky testified at the April 2022 preliminary injunction hearing that Mr. Diaz continued to threaten him after Mr. Snorsky was placed in the day hall next to Mr. Diaz's at CSP—including "calling [Mr. Snorsky] a bitch and a rat," and saying that when he assaulted Mr. Snorsky he "just laid there like a bitch and . . . didn't fight back."[44]

Mr. Snorsky reports that corrections officers routinely ignore the misconduct by the Bloods gang. This is evident from the fact that, after Mr. Diaz's attack, he was not removed from Protective Custody (meaning he continued to have unfettered access to Mr. Snorsky until he was moved, *see infra* Pages 13-14), nor was a custody issue ever entered for Mr. Diaz and Mr. Snorsky.[45] Given Mr. Diaz's violent attack on Snorsky and the CDOC's inability to minimize the risk while in Protective Custody—let alone general population—it is my opinion that Mr.

---

[38] *See supra* n. 34.

[39] Prelim. Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony at 93:4-19.

[40] Prelim. Injunction Hearing Transcript [ECF No. 160], Johnson Testimony at 136:10-22.

[41] *Bloods Gang Member Sentenced to 30 Years in Federal Prison After Advanced Ballistic Technology Ties Shall Casings at Murder Scenes to Defendants' Firearms*, Department of Justice, U.S. Attorney's Office, District of Colorado, available at https://www.justice.gov/usao-co/pr/bloods-gang-member-sentenced-30-years-federal-prison-after-advanced-ballistic-technology, last visited February 21, 2023 ("Bloods gang members and associates use intimidation, violence, and threats of violence in order to preserve, expand, and protect their claimed territory, as well as to enhance the reputation of an individual member or associate, as well as the organization, within the community.").

[42] Prelim. Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony at 81:23-25.

[43] *Id.* at 80:23-81:3.

[44] *Id.* at 85:14-20.

[45] *Id.* at 133:2-7.

Snorsky also faces an imminent risk of bodily harm or death from members of the Bloods gang because of this attack by Mr. Diaz.

**3. Protective Custody Offers Threatened Prisoners like John Snorsky Significant Protections from Other Prisoners that are Not Available in General Population.**

Protective Custody differs significantly from general population. Protective Custody offers protections that significantly increase the likelihood Mr. Snorsky is safe from the 211 Crew. Among the protections afforded prisoners like Mr. Snorsky in Protective Custody are:

- Confidentiality. Prisoners' identities in Protective Custody are kept secret from other prisoners. Confidentiality is taken very seriously, and prisoners in Protective Custody are isolated from individuals in other units. For example, when special meals are delivered, they are not labeled with prisoners' names or even their full identification number. For another example, there is no "name board" in Protective Custody. In every other unit at CDOC that I've worked in, there is a "name board," which is a large whiteboard in the office of a particular unit. There are names listed on the name board so that when a prisoner is moved from one unit to another, staff can track where inmates are at any given time. The unit supervisor can then physically move the name-tag from the board and put it up on the other unit's board. This practice results in a constant visual of where inmates are. You can see when a particular inmate is "out to work," "medical," etc. The name board is typically visible to prisoners as they walk by the office. There is no "name board" in Protective Custody, so there is no opportunity for other prisoners to identify who is in Protective Custody at any given time. Confidentiality is the single most effective strategy for protecting targeted prisoners like Mr. Snorsky. If no one knows who you are, then it is very difficult for gang members to identify you and carry out violence against you.

- Additional Supervision. Protective Custody also benefits from additional supervision of inmates. In non-Protective Custody units, prisoners are required to do a certain amount of "rounds" with officers. In Protective Custody, there are significantly more rounds, if not an officer present at all times. When I was a supervisor in Protective Custody, for example, I required that an officer be on the floor all the time to keep tabs on what is going on and making sure one Protective Custody prisoner is not harming another.

- No Interaction Between Protective Custody Prisoners and Other Prisoners. In Protective Custody, extensive measures are taken to ensure that prisoners are never exposed to prisoners from other non-Protective Custody units. For example, Protective Custody prisoners cannot go to the prison library where they might be identified by other inmates. Library staff go directly to the Protective Custody unit to assist the prisoners there. When Protective Custody prisoners need to leave the unit for some reason—like medical or dental care, for example—officers close the entire corridor so that no other non-Protective Custody prisoners can make any contact with the prisoner being moved. When the corridor is closed, there is absolutely no prisoner movement whatsoever within the facility as a whole. Corrections officers use radios to

14

ensure the doors have been secured and then personally escort prisoners to their destination. This is very different from general population, where prisoners have access to one another in their cells, during free time, and during work hours.

**4. Alternatives to Protective Custody Will Not Protect John Snorsky from the Threat of Serious Bodily Injury or Death Posed by the 211 Crew and Affiliated Prison Gangs.**

The CDOC has proposed a number of alternatives to keeping Mr. Snorsky in Protective Custody. It is my opinion, based on my experience and review of the facts of this matter (as well as my personal knowledge of the same) that these proposals will not offer Mr. Snorsky significant protection from the very real threat of the 211 Crew and the other gangs that have previously targeted Mr. Snorsky.

1. *Custody Issues*. First, the CDOC has argued that it can adequately protect Mr. Snorsky by implementing a "custody issue" for Mr. Snorsky and the specific 211 Crew members and other gang members who have threatened or attacked him. In essence, CDOC proposes that they not house Mr. Snorsky directly with specific prisoners like Mr. Merrill. The threat to Mr. Snorsky is not limited to these specific individuals but instead extends to every member of the 211 Crew, the GKI, the CMG Bloods, the Hawaiian Family, and the Northside Mafia. The 211 Crew is an exceptionally large gang with reach beyond its official members. And while the CDOC makes efforts to identify prisoners affiliated with the 211 Crew, there is no way to know exactly which prisoners are so affiliated. And the gang is recruiting new members every day, often by intimidation and violence. The idea that Mr. Snorsky could be protected by not housing him with specific individuals like Mr. Merrill overlooks the nature of prison gangs generally, but particularly with respect to the unprecedented reach and organization of the 211 Crew. The evidence in this case is unequivocal that implementing "custody issues" is not sufficient to protect Mr. Snorsky. For example, it was unrefuted at the preliminary injunction hearing that Mr. Snorsky and Mr. Payne wrote to Lt. Johnson, explaining that Payne had been ordered to kill Mr. Snorsky, and that Lt. Johnson declined to take any action based on this information[46]— despite the fact that Lt. Johnson himself had seen Mr. Snorsky's name on a North Side Mafia hit list.[47] Lt. Johnson testified that Mr. Snorsky's name had a star drawn next to it along with the word "rat."[48] Similarly, no custody issue was entered after Mr. Diaz's attack on Snorsky in February 2021, and they continued to be housed together after the attack.[49] And Mr. Diaz continued to threaten Snorsky after the attack.[50] For another

---

[46] Prelim. Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony, at 87:24-88:9.

[47] Prelim. Injunction Hearing Transcript [ECF No. 160], Johnson Testimony, at 136:10-22.

[48] *Id.*

[49] *See* Defs.' Amended Resp. to Doc. 121 [ECF No. 150].

[50] Prelim. Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony, at 82:9-85:20. Mr. Diaz explicitly threatened Mr. Snorsky in March 2022, when he yelled through the door connecting his day hall to Mr. Snorsky's, calling Mr. Snorsky a "bitch" and a "rat." *Id.* at 85:8-16. According to Mr. Snorsky, these threats were intended to notify other prisoners that Mr. Snorsky was a snitch, *id.*, which

15

example, Mr. Snorsky has received death threats from prisoner Brett Boyles (who is responsible for the 2018 murder of Matthew Massaro), a close affiliate of Chad Merrill and the 211 Crew, and no custody issue has been entered regarding Mr. Snorsky and Mr. Boyles.[51] This is further evidence that the procedures in place in general population are insufficient to protect threatened prisoners like Mr. Snorsky. And that makes sense—general population is not designed for that purpose; Protective Custody is. Nor is the threat to Mr. Snorsky necessarily limited to the four prison gangs that have targeted him in the past, as it is common for these gangs to put a "bounty" on another inmate's head or "hire" another gang or group of inmates unaffiliated with the gang to carry out a hit. The CDOC has not made any information available to Mr. Snorsky to suggest that the "custody issues" they propose will address the concerns raised at the previous hearing.

Second, in general population, there are abundant opportunities to interact with prisoners outside your specific housing unit or "day hall." Mr. Merrill is extremely violent. He suffers from psychological issues that make him unpredictable. He has murdered multiple prisoners while in the CDOC. It is simply not possible, within general population, to ensure that Mr. Snorsky never comes into contact with Mr. Merrill—even if he is housed in a different unit or day hall.

Third, as Lt. Johnson acknowledged during the April 2022 preliminary injunction hearing, inmates in different day halls have several ways that they can communicate with each other. They can use "dirty sign language, going fishing in the toilets, outside through the chain link fences during rec[reation] time, through the metal mesh window in the rec area inside the day hall, passing notes under the day hall doors, [and] third party calls with individuals outside of CSP."[52] So the existence of custody issues for Mr. Snorsky and Mr. Clark, Mr. Trujillo, Mr. Samson, and Mr. Merrill does not in any way prevent them from ordering other inmates (let alone members of their respective gangs) to carry out a hit on Mr. Snorsky.

Any proposal that Mr. Snorsky be kept in so-called "soft pods"—in which CDOC only houses Mr. Snorsky in a day hall with other "vulnerable" prisoners but outside of Protective Custody—suffers from the same flaws. 211 Crew, GKI, Northside Mafia, CMG Bloods, and Hawaiian Family gang members can still identify and interact with

---

is consistent with gang-related cooperation and intimidation I have seen in my career. *See also id.* at 77:3-80:22; 84:25-85:2. Additionally, Mr. Diaz and Mr. Snorsky had unrestrained contact even when the two were ultimately separated. *See id.* (Mr. Snorsky explaining that even when Mr. Diaz was not in his day hall, the two still had unrestrained contact in the hallway during which Mr. Diaz could have physically attacked him); *see* Prelim. Injunction Hearing Transcript [ECF No. 160], Moore Testimony at 186:1-11 (corroborating Snorsky's testimony).

[51] Prelim. Injunction Hearing Transcript [ECF No. 160], Snorsky Testimony at 100:16-101:10; *see also id.* (Johnson Testimony) at 133:8-18 (explaining that Mr. Boyles and Mr. Merrill are in the same gang); *id.* at 134:23-135:19 (Lt. Johnson testifying that there is nothing on paper that would prevent Mr. Boyles and Mr. Snorsky from being housed together if they obtained the same housing classification).

[52] Prelim. Injunction Hearing Transcript [ECF No. 160], Johnson Testimony at 128:3-129:11.

    Mr. Snorsky during times when the prisoners are outside of their housing units or day halls. Nor is there any indication that members of these gangs are prohibited from being placed in these "soft pods" with Mr. Snorsky. If anything, putting all the "vulnerable" prisoners together in a single unit that is still accessible to other members of the facility only puts those prisoners at a greater risk of being identified and harmed.

2. ***Out of State Custody***. Transferring Mr. Snorsky to a general population unit in another state will not remedy these safety concerns. Gangs (particularly prolific gangs like the 211 Crew) can—and frequently do—communicate across state lines. Prisoners are constantly using pay phones to communicate. While their phone calls *can* be monitored, they have developed codes by which to communicate, and plan acts of violence like the 2013 murder of Mr. Clements. Prisoners have contact with friends outside of prison who can help them locate prisoners in other states.

    Indeed, since the 211 Crew's murder of Mr. Clements in 2013, prison officials began transferring 211 Crew members to prisons across the United States. The most dangerous members of the 211 Crew—the "inner circle" with a rank of general, which means they have a vote when it comes to ordering violence against other inmates or officials—are now outside Colorado's prison system and housed in federal prisons in Wyoming, Pennsylvania, West Virginia, Kentucky, and Ohio. While swapping 211 Crew members through the Interstate Corrections Compact can disrupt communications between the gang, it also spreads gang ideology—"especially for a gang such as 211 Crew, which has name recognition across the country. Charismatic gang leaders spread their racist dogma and internal gang leadership strategies to other prison systems." The 211 Crew is particularly effective at recruiting new members in other states because of the "extraordinary" and unprecedented killing of Mr. Clements. In short, "it is virtually impossible to cut off all communications among criminals regardless of how far away prison officials send them."[53]

    In 2006, Denver prosecutors proved in a massive racketeering case against 24 members of the gang that one 211 Crew leader effectively orchestrated beatings and murders from solitary confinement cells at various high-security prisons across Colorado and from as far away as Wisconsin. It is my opinion that transferring Mr. Snorsky to an out-of-state facility where he will still be in general population will not extinguish the severe threat to him from the 211 Crew, which operates not only in Colorado but in prisons across the country. This is particularly true when the threat against Mr. Snorsky from other gangs affiliated with the 211 Crew (such as the Bloods, for example) is considered.

3. ***Mr. Snorsky's Alleged Behavioral Issues***. Finally, there is no reason to believe CDOC officers will have more "control" over Mr. Snorsky and his alleged behavioral issues in general population than Protective Custody. Prisoners in Protective Custody can be written up, and have their privileges revoked, just like prisoners in general population. If Mr. Snorsky violates prison rules, he can be written up and his privileges temporarily

---

[53] *See supra* n. 2.

17

revoked. The fact that Mr. Snorsky sometimes has an attitude and gets himself into trouble is no reason to return him to general population, where he is undoubtedly in danger of serious bodily injury or death.[54] The CDOC's argument in this regard is tantamount to an executive-ordered death sentence for routine prison infractions.

For these reasons, it is my opinion that there is no reasonable housing alternative for Mr. Snorsky than permanent placement in Protective Custody.

Finally, I note that Mr. Snorsky's circumstances exceed the requirements set forth in the Administrative Regulation for Protective Custody, Reg. No. 650-02. This regulation requires that alternative housing be available "for offenders who are at substantial risk of serious harm if placed in a general population setting." For the reasons set forth above, there is a substantial if not imminent risk of bodily harm or death if he is returned to general population. Regulation 650-02 compels Mr. Snorsky's continued housing in Protective Custody. Critically, there is no time limit on Protective Custody found in this regulation. If a prisoner is at a "substantial risk of serious harm if placed in a general population setting," they must be in Protective Custody. There is no reason to believe that the threat against Mr. Snorsky from the 211 Crew and the affiliated gangs described above will dissipate at any time in the future. Accordingly, pursuant to my experience implementing A.R. 650-02, it is my opinion that it requires Mr. Snorsky's permanent placement in Protective Custody.

## **CONCLUSION**

Based on my experience, review of the relevant facts, and my research, it is my opinion that Mr. Snorsky will be in danger of serious bodily injury or death if returned to any non-Protective Custody unit. Unless significant new facts come to light, the "protections" proposed by the CDOC—which have not protected Mr. Snorsky in the past—will not protect him in the future.

---

[54] This would not be the first time CDOC officials ignored credible threats of violence from the 211 Gang toward a particular prisoner just because some corrections officers did not like that particular prisoner. Emails from CDOC officials showed that they considered one prisoner targeted by the gang, Scott Howard, an "admitted homosexual" and "smart con artist," whose allegations of sexual assault by the 211 Gang were "unprovable" and would not "go far." The CDOC attitude was: "Howard seems to think he can just say the mean old 211 guys made him do it and walk away." Even after complete cooperation with the authorities against the 211 Gang, the CDOC official did nothing to protect Mr. Howard. "They just sent me back to my cell. I told a CDOC captain that the 211 Gang would "kill me if I didn't come up with $300,000 by March. The captain's response was: 'Let's see what happens in March.'" Just like with Mr. Snorsky, the CDOC ignored the fact that Mr. Howard was in critical danger and temporarily separating him from known 211 Gang members. He made countless complaints detailing the reasons why he feared for his life. CDOC officials overheard direct threats and ignored them. Mr. Howard was continually raped. When the rapes were reported, CDOC officials responded: "The guy's a drama queen. Don't worry about it." Although a district court judge originally dismissed Mr. Howard's civil rights lawsuit against these officials, the Tenth Circuit reversed, holding that there was evidence that prison officials knew Mr. Howard "faced an ongoing risk from a prison gang with substantial presence" but failed to take reasonable steps to protect him. *See supra* n. 5.

The threat to Mr. Snorsky from the 211 Crew, GKI, North Side Mafia, Hawaiian Family, the CMG Bloods, and their affiliates is not likely to subside over time. Prison gangs do not simply forget that other inmates have cooperated in criminal investigations of them. The only available option for offering Mr. Snorsky meaningful protection from these threats is to continue housing him in Protective Custody unless and until some information comes to light extinguishing the threat from each of these gangs—a situation I find hard to imagine. I find the CDOC's position on this matter mind-boggling.

If you have any questions about my opinions, please do not hesitate to contact me. Should further information about this matter come to my attention, I may wish to update my opinions.

                          Respectfully submitted,

Dated: February 24, 2023

                          *Monte K. Gore*

                          _____
                          Monte K. Gore